**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JOHN A. BARRETT, JR., and SHERYL S. BARRETT, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | NO. CIV-06-0968-HE |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

## ORDER

The Internal Revenue Service ("IRS") determined plaintiffs John and Sheryl Barrett failed to report, on their joint 2001 federal income tax return, certain taxable wages John Barrett received in that year. The IRS assessed additional federal taxes, plus a penalty and interest, which the plaintiffs paid. After the IRS denied their claim for refund, the plaintiffs filed this action claiming an overpayment of $38,623.73. Both parties have moved for summary judgment. They stipulated to the following facts, some of which are pertinent only as background information.[1]

John Barrett ("Barrett") is a member of the Citizen Potawatomi Nation f/k/a/ Citizen Band Potawatomi Indian Tribe ("Tribe"), a federally recognized tribe of American Indians. He attended Princeton University and Oklahoma City University, graduating with a degree

---

[1] *A few additional facts, taken from the Plan for the Use and Distribution of the Potawatomi Nation Judgment funds, 48 FR 405671, and exhibits to the stipulation, have been included with those from the stipulation. Despite the stipulation, the plaintiffs included a statement of undisputed material facts in their brief. The defendant disputes several of their factual statements, but only one (¶20) requires discussion here. It is addressed subsequently in this order.*

in business. Barrett has been the Chairman of the Tribe since 1985, having been repeatedly reelected by the Tribe's general membership.[2] Apart from his activities with the Tribe, Barrett has been successful in various business activities and is involved in the oil and gas, cattle and land development businesses.

The Tribe's Constitution specifies the duties of the Chairman and also provides for a Business Committee, which consists of the Chairman, Vice Chairman, Secretary/Treasurer and two Councilmen, all of whom are elected by the Tribe at their annual meeting. While the Tribe had minimal funds and land in 1971, today it has a multi-million dollar annual cash flow and fourteen separate businesses which it operates. The Tribe manages thirty contracts for the United States government and owns and operates the First National Bank & Trust Company, Shawnee, Oklahoma. Barrett serves as the Chairman of the Bank's Board of Directors.

In the late 1940's and early 1950's, the Tribe sought compensation for the federal government's taking of Indian lands without payment or without payment of the agreed compensation. Claims were filed with the Indian Claims Commission ("Commission") pursuant to the Indian Claims Commission Act, 25 U.S.C. §§ 70-70v-3. The Commission made awards with respect to some of the claims in the mid-to-late 1970's. Eighty percent of

---

[2]*Barrett initially worked only about twenty hours per week as Chairman. The stipulation indicates the Tribe employed an administrator to manage the Tribe's office until 1996, when Barrett assumed the duties of Chairman on a full-time basis. Apparently, the administrator's position was not formally abolished until 2002. Stipulation, ¶¶35, 36; Exhibit 8.*

those awards were distributed pro-rata to all members of the Tribe in accordance with a distribution plan approved by the Secretary of the Interior of the United States ("Secretary"). The remaining twenty percent were to be held in perpetual trust by the Secretary, "with the income from such funds to be used for specific activities of the Tribe, including health aids, prosthetics and scholarships." Stipulation ¶17. The Tribe budgeted and disbursed monies from the trust funds to qualifying members of the Tribe for health aids, prosthetics and scholarships. Those disbursements were not taxable income to the recipients.

The Commission made awards for the remaining claims in the 1980's. Under another distribution plan ("1983 Plan" or "Plan") approved by the Secretary, seventy percent of these awards were distributed pro-rata to all members of the Tribe. The remaining thirty percent of the awards ("set-aside funds"), allotted to the programming aspect of the Plan, were to be used "in a Ten-Year Tribal Acquisition, Development, and Maintenance Plan." 48 FR 40567, ¶5(d). These funds were to be "held in perpetual trust by the Secretary of Interior, with the income from such funds to be used for real estate acquisition, development of the Tribe, including increasing the effectiveness of the Government, and the maintenance of the property of the Tribe."[3] Stipulation ¶19. The Plan provided that "[n]one of the funds distributed per capita or made available under this plan for programing shall be subject to Federal or State income taxes ...." 48 FR 40567, ¶6(b). The Secretary approved a budget

---

[3]*At the end of the ten year period the General Council was to "evaluate tribal needs as concerns the remaining balances in the program principal and interest accounts" with any changes proposed being subject to the Secretary's approval. 48 FR 40567 ¶5(d)(iii).*

and guidelines ("Guidelines") for the expenditure of the set-aside funds on January 2, 1985. Stipulation, Exhibit 3.  The Guidelines defined the terms acquisition, development and maintenance. *Id.* Development is defined as "those activities and/or actions undertaken by the Tribe to in some way cause growth, building up, expansion, strengthening, increased effectiveness or other evolutionary process toward the progress of the Tribe economically and/or socially, and/or governmentally." *Id.* § 1.4.  The Tribe voted yearly on how the income earned from the trust funds maintained by the Secretary would be spent.[4]

After passage of the American Indian Trust Fund Management Reform Act of 1994, the Tribe voted to take control of, and manage, the trust funds.[5]  In 1996, the Business Committee authorized the Chairman to effectuate the transfer of the trust funds' management to the Tribe.  The Secretary approved the Tribe's removal of the trust funds, subject to their use and management consistent with an Investment Management Policy the Tribe had submitted to the Secretary.[6]  *See* Stipulation, Exhibit 5.

The Tribe maintains the trust fund in a separate trust account.  Earnings from the fund that are to be spent each year are placed in the Tribe's general fund account as a sub-account.

---

[4]*The Guidelines provided that the programming aspect of the distribution plan would be operated from interest earnings only, unless it was absolutely necessary to invade the principal. Stipulation, Exhibit 3, ¶1.3.*

[5]*The funds retained their trust fund status after withdrawal.*

[6]*Under the investment management policy, the earnings withdrawn from the trust were to be used for the same purposes as when the trust funds were managed by the Secretary – "for medical devices (i.e. prosthetics, dentures, eyeglasses), higher education/scholarships and a general purpose investment fund." Stipulation, Exhibit 5, § I (B)(2).*

The Business Committee determines how the earnings are spent, subject to the approval of the Tribe. Stipulation, Exhibit 1, Article 5, § 3, Exhibit 5, § X. The principal is not to be invaded and earnings not included in the Tribe's budget become part of the fund's principal. The Secretary requires that the trust funds be audited yearly by an independent auditor.

Sometime after 1992, Barrett became aware of certain rulings of the IRS, including Revenue Ruling 59-354.[7] He concluded, in 1996, that he could be paid from earnings accrued from the Tribe's trust fund and that such income would be nontaxable. Barrett suggested to the Business Committee that he be paid from the trust fund and contacted the Tribe's accounting department, informing it that the Business Committee had decided that he would be paid from the sub-account in the General Fund. That account held amounts earned from the trust fund monies that had been budgeted for the Tribe's use. Barrett directed the accounting department not to withhold taxes from his compensation and not to issue him a W-2 form.

In 2001, the plaintiffs did not include in their reported income the sum of $48,057.64 that Barrett was paid out of the trust fund earnings for the work he performed as Chairman of the Tribe.[8] The IRS subsequently determined that compensation to be taxable income and

---

[7]*Revenue Ruling 59-354 determined that compensation for the duties performed by elected tribal council members should be excluded from the definition of 'wages' for purposes of a tribe's obligations as to FICA, FUTA, and income tax withholding. See Doxtator v. Comm'r,,89 TCM (CCH) 1270, 2005 WL 1163978 (2005). The significance of the ruling is discussed subsequently.*

[8]*For the 2001 tax year, the plaintiffs reported an adjusted gross income of $789,495.00 and a total tax liability of $266,013.00, which was paid in full.*

issued a Notice of Deficiency on June 16, 2005. The IRS assessed additional income taxes in the amount of $19,355.00, a penalty of $3,871.00, and accrued interest in the amount of $2,552.47 against the plaintiffs. The plaintiffs paid these amounts, plus an additional sum which was applied as an overpayment to their 2004 tax year. The plaintiffs requested a refund of the amounts paid that related to the Barrett's compensation as Chairman. The IRS denied the refund claim in full and the plaintiffs filed this lawsuit.

## Discussion

The case presents two issues: whether the compensation Barrett received in the year 2001, as the Tribe's Chairman, is taxable income to him and, if so, whether the plaintiffs are liable for the penalty assessed pursuant to 26 U.S.C. § 6662. While the plaintiffs acknowledge that American Indians, as U.S. citizens, generally are subject to the federal income tax, they claim the compensation is not taxable income because the source of the funds used to pay Barrett was trust fund monies previously awarded by the Indian Claims Commission to the Tribe. The plaintiffs assert that those funds "have been impressed with tax exemption to their recipients," and "[t]he "Tribe, as a governmental act, has made the conscious decision to pay the Chairman from these funds." Plaintiffs' motion, p. 2.

The compensation Barrett received is taxable income "unless an exemption is created by treaty or statute." Allen v. Comm'r, 91 TCM (CCH) 673, 2006 WL 177408, at *2 (2006), *aff'd,* 204 Fed.Appx. 564 (7th Cir. 2006); *see also* Squire v. Capoeman, 351 U.S. 1 (1956). Plaintiffs assert that because the 1983 Plan specified that none of the funds "made available under this plan for programming shall be subject to Federal or State income taxes," Congress,

by approving the Plan,[9] exempted funds paid for programming from taxation. They claim that the compensation Barrett received fell within the 1985 Guideline's definition of "development," which definition was "carried forward under the Investment Management Policy to the current funds held by the Tribe ...." *See* plaintiffs' motion, pp. 19-20; Plaintiffs' statement of undisputed material facts, ¶20.[10]

While Congress, by its inaction, approved the 1983 Plan, there is no evidence that it also approved the Guidelines. The Guidelines, through its definitions of pertinent terms, could not expand the income exemption created by Congress. The 1983 Plan is consistent with the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§1401-1408, which provides that "[n]one of the funds which – (1) are distributed per capita or held in trust pursuant to a plan approved under the provisions of this chapter, ... including all interest and investment income accrued thereon while such funds are so held in trust, shall be subject to federal or State income taxes ...." 25 U.S.C. § 1407. The programming expenditures contemplated in the Plan are the Tribe's purchase of assets and investments to be held in trust for the Tribe. *See* 48 FR 40567 § 5(d) ("The funds for the programing aspect (30%) shall be

---

[9]*A distribution plan became effective unless, within sixty days after its submission to Congress, a joint resolution was enacted disapproving it.*

[10]*Citing Barrett's affidavit, the plaintiffs contend that "[u]nder the Investment Management Policy, the purposes and uses for the expenditure of the earnings withdrawn from the trust pursuant to the annual budget approved by the electorate remained the same as those in effect during the trust management tenure of the Secretary of the Interior." Plaintiff's motion, Statement of Undisputed Material Facts, ¶20. The defendant disagrees. See defendant's response, pp. 1-2.*

utilized in a Ten-Year Tribal Acquisition, Development, and Maintenance Plan. The 10-year plan shall include the acquisition of additional lands to build upon the tribal land base, the development of the tribe's assets and to provide for the maintenance and care of the tribal property ...."). Compensation paid to Barrett ceased to be held in trust by the Tribe at the point it was so paid and, in any event, was not a "programming expenditure" as that term is used in the 1983 Plan.

Even if the monies Barrett received could conceivably be considered as an exempt expenditure under the 1983 Plan, the court agrees with the defendant that the Plan and the accompanying Guidelines pertain only to the Tribe's use of the funds in conjunction with its "Ten-Year Tribal Acquisition, Development, and Maintenance Plan," and do not apply to any distributions after the 1983 Plan expired. The Investment Management Policy, which governed the disbursement of trust fund earnings in 2001, neither refers to the 1983 Plan[11] or the Guidelines nor incorporates any of their provisions or definitions.[12] Nothing in that document indicates an intent to exempt wage disbursements from taxation or to include the

---

[11]*The 10-year Plan is mentioned in Exhibit C to the Investment Management Policy, with respect to amounts projected to be withdrawn from the Tribe's investment trust.*

[12]*As the plaintiffs assert in their reply brief, the Investment Management Policy did state that "[t]he purpose and use of the earnings form the Investment Accounts, will continue to be consistent with the original claims settlements ...." Stipulation, Exhibit 5, p.2. Significantly, the plaintiffs omit the rest of the statement: "to wit: for medical devices (i.e. prosthetics, dentures, eyeglasses), higher education/scholarships and a general purpose investment fund." Id. In any event, the present dispute is over the taxability of the funds, not the propriety of the purpose and use of them.*

broad definition of "development" on which the plaintiffs rely.[13]

The plaintiffs cite no other basis for their claimed tax exemption and cite no authority that supports their argument that Barrett's compensation was nontaxable income. Case authority is to the contrary. Courts have repeatedly held that amounts received by an Indian for services performed as a member of a tribal council are taxable, even if the monies "had their origin in funds which were held in trust by the Government and which were derived for the most part directly from tribal lands held in trust by the Government for the benefit of the respective tribes." Hoptowit v. Comm'r, 78 T.C. 137, 146-48 (1982), *aff'd*, 709 F.2d 564 (9th Cir. 1983); *see* Comm'r v. Walker, 326 F.2d 261 (9th Cir. 1964). *See generally* Mescalero Apache Tribe v. Jones, 411 U.S. 145, 156 (1973) ("Absent a 'definitely expressed' exemption, an Indian's royalty income from Indian oil lands is subject to the federal income tax although the source of the income may be exempt from tax."). As the defendant notes, if the plaintiffs are correct, then any employee of the plaintiffs' Tribe or one of the other Potawatomi tribes listed on the 1983 Plan, who provides services benefitting their tribe, could claim their wages to be tax exempt if they were paid from the same source of funds.

In its motion, defendant asserts that plaintiffs rely on a 1959 revenue ruling, Rev.Rul.

---

[13]*Having reached this conclusion, it is unnecessary to address the government's argument that the exemption in the 1983 Plan was "a federal agency exemption ... valid only to the extent of the authority of the Secretary of the Interior." Defendant's response, pp. 5-6.*

59-384,[14] Internal Revenue Manual § 4.88.1.6.3.1,[15] and other statutes and treaties to support their position of no tax liability. These authorities, while cited as the bases for the plaintiffs' refund claim (Exhibit 4 to defendant's motion, Attachment to Form 1040X, plaintiffs' Amended Federal Income Tax Return), were not relied on or discussed by the plaintiffs in their summary judgment motion and supporting brief. The plaintiffs did address them, in part, in their response to the defendant's motion, but these authorities do not exempt Barrett's compensation from taxation.

Due to the absence of an exemption "based upon clearly expressed language in a statute or treaty, <u>Doxtator v. Comm'r</u>, 89 TCM (CCH) 1270, 2005 WL 1163978, *4 (2005), the undisputed facts establish that the $48,057.64 Barrett received as compensation from the Tribe was taxable income.

The remaining issue is whether the plaintiffs have set out sufficient evidence to create a material fact question as to the propriety of the accuracy-related penalty under 28 U.S.C. Sec. 6662. A penalty is warranted if a taxpayer's underpayment of tax is attributable to:

---

[14]*The plaintiffs state that they rely on Revenue Ruling 59-354 only for its recognition that income can be tax exempt if an exemption is created by a statute or treaty. The ruling pertains to the Indian tribes' liability for FICA and FUTA taxes. See Rev.Rul. 59-354. It "excludes compensation for the duties performed by elected tribal council members from the definition of 'wages' for the purposes of FICA, FUTA, and income tax withholding," but "does not exempt [Barrett]'s income from tax." <u>Allen</u>, 2006 WL 177408, at \*3.*

[15]*The plaintiffs state that "[t]he Barretts' reference to the Internal Revenue Manual is applicable, but irrelevant." Plaintiffs' response, p. 10.*

"[n]egligence or disregard of rules or regulations."[16] 26 U.S.C. § 6662(b). "[N]egligence includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." 26 U.S.C. § 6662(c). A penalty is not imposed under § 6662 "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). The taxpayer must demonstrate both reasonable cause for the underpayment and that he acted in good faith. Van Scoten v. Comm'r, 439 F.3d 1243, 1259 (10th Cir.2006) ("Section 6664(c) of the Tax Code provides an exception to § 6662(a)'s addition to tax for any portion of an underpayment if the taxpayer can show that there was a reasonable cause for, and the taxpayer acted in good faith with respect to, that portion.").

Plaintiffs assert that if they underpaid their taxes for the 2001 tax year, they had reasonable cause for the underpayment and acted at all times in good faith. They claim that it is not just Barrett's position that his income is tax-exempt, but also that of the Tribe. Their actions were not hidden, the plaintiffs assert, as the Business Committee approved the payment from the trust funds and both the auditor of the Tribe's records and the Tribe's accounting department were aware of the Tribe and Barrett's position that the compensation was not subject to Federal income tax. The plaintiffs argue that their situation is akin to that

---

[16]*A penalty also can be imposed for "[a]ny substantial understatement of income tax," but the defendant seeks imposition of the penalty based solely on the taxpayers' asserted negligence or disregard.*

of the plaintiffs in <u>Lazore v. Comm'r</u>, 11 F.3d 1180 (3d Cir. 1993), where the taxpayers claimed they were exempt from tax based on several treaties and the Constitution.

The defendant argues that not only did the plaintiffs make no effort to determine their proper tax liability, they took affirmative steps to prevent the IRS from determining the tax owed by preventing the Tribe from issuing Forms W-2 or 1099.[17] The defendant contends that <u>Lazore</u> is inapposite as here the plaintiffs cite no authority to support their position that Barrett's income was exempt from taxation and no evidence, other than Barrett's affidavit, to demonstrate the Tribe's belief that his compensation was nontaxable.

"The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). "Reasonable cause and good faith might be indicated by 'an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer.'" <u>Van Scoten</u>, 439 F.3d at 1259 (quoting Treas. Reg. § 1.6664-4(b)(1)). "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Treas. Reg. § 1.6664-4(b)(1).

If the present motion turned only on the issue of the plaintiffs' subjective good faith, the court would likely conclude that sufficient evidence has been presented to create a fact

---

[17]*The plaintiffs respond that while disclosure may affect the penalty imposed there is no obligation to disclose "the relevant facts affecting the item's tax treatment." 26 U.S.C. §6662(d)(2)(B)(ii)(I). As plaintiffs' good faith or its absence is not determinative of the present motion, it is unnecessary to resolve the issue here.*

question as to that issue.[18] However, as noted above, the taxpayer's determination must have been in good faith <u>and</u> with "reasonable cause." The latter standard is an objective one and the question hence becomes whether plaintiffs have presented sufficient evidence, under the standards applicable to summary judgments, to create a material question of fact as to the objective reasonableness of the position they took as to the taxability of the disputed income. The court concludes they have not.

The only authority to which the plaintiffs point in justifying the reasonableness of their filing was their reading of Revenue Ruling 59-384, particularly its reference to income potentially being exempt due to treaties or statutes, and their reading of the various statutes and plans adopted pursuant to them.[19] However, the referenced revenue ruling clearly points out the general principles of law applicable in this area: that payments to tribal members are includable in the member's gross income unless an exemption "derive[s] plainly" from a statute or treaty.[20] The relatively convoluted argument upon which the plaintiffs rely to trace their theory of non-taxability cannot be said to be "plain" by any stretch. Not only is it contrary to general principles of taxability of payments to tribal members, but it also

---

[18]*Although plaintiffs' submissions do not reflect the usual actions or circumstances as would evidence good faith, such as upfront disclosure of their position to the IRS, reliance on the advice of an attorney or tax professional, or reliance on some other authority supporting their position, Mr. Barrett's affidavit as to his own subjective understanding of the law would likely have been sufficient to create a fact question as to good faith.*

[19]*Stipulation, ¶ 37.*

[20]*See also,* <u>Squire v. Capoeman</u>, *351 U.S. at 6: "We also agree that, to be valid, exemptions to tax laws should be clearly expressed."*

substantially misreads the statutes in question, taking provisions of them which are directed to taxation of the Tribe and applying them instead to taxation of the recipients of tribal funds. It applies the various tax exemption provisions in ways and contexts outside their proper scope. In any event, the court concludes that the plaintiffs' position as to the tax treatment of Barrett's salary, though inventive, is outside the bounds of what can be termed objectively reasonable. Under these circumstances, the court concludes that the underpayment was attributable to negligence or disregard and the penalty was therefore properly imposed.

In light of the foregoing, defendant's motion for summary judgment [Doc. #33] is **GRANTED** and the plaintiff's motion [Doc. #35] is **DENIED**.

**IT IS SO ORDERED**.

Dated this 5th day of December, 2007.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE